# Exhibit 2



**New York State's Protection & Advocacy System and Client Assistance Program**

# PRELIMINARY INVESTIGATION REPORT: NEGLECT AT FERNCLIFF MANOR

725 Broadway, Suite 450
Albany, New York 12207
(518) 427 -6561 (fax)

25 Chapel Street, Suite 1005
Brooklyn, New York 11201
(718) 797-1161 (fax)

44 Exchange Blvd, Suite 110
Rochester, New York 14614
(585) 348-9823 (fax)

mail@DisabilityRightsNY.org • www.DisabilityRightsNY.org

(800) 993-8982 (toll free) • (518) 432-7861 (voice) • (518) 512-3448 (TTY)

## Executive Summary

Disability Rights New York ("DRNY") is the designated federal Protection and Advocacy System ("P&A")[1] for individuals with disabilities in New York State. One of DRNY's core functions is to investigate allegations of abuse and neglect of persons with disabilities. DRNY has authority under federal and state law to thoroughly investigate allegations of abuse or neglect occurring in any public or private entity that provides care, services, treatment or habilitation to individuals with disabilities. *See* 42 U.S.C. § 15043(a)(2)(B); 45 C.F.R. § 1386.22; N.Y. Exec. Law § 558(b)(ii)-(iii).

Pursuant to its statutory authority, DRNY is investigating allegations of abuse and neglect at the School for Adaptive and Integrated Learning (S.A.I.L.) at Ferncliff Manor ("Ferncliff"). This report enumerates DRNY's preliminary investigatory findings and recommendations. Although the investigation is ongoing, DRNY is issuing this report due to the exigency and severity of its findings. DRNY has found that:

1.  Ferncliff failed to conduct Functional Behavioral Assessments (FBAs) for students who exhibited persistent behaviors that impeded their learning or the learning of others, despite school-wide or classroom-wide interventions, as required by 8 N.Y.C.R.R. §§ 200.4(b)(1)(v), 200.22(a), and 200.22(b)(1)(i).

2.  Ferncliff failed to conduct FBAs for students whose behavior placed them or other students at risk of harm or injury, as required by 8 N.Y.C.R.R. §§ 200.4(b)(1)(v), 200.22(a), and 200.22(b)(1)(ii).

3.  Ferncliff failed to create and implement systematic Behavioral Intervention Plans (BIPs) designed to change, replace, modify or eliminate targeted behavior, as required by 8 N.Y.C.R.R. §§ 200.1(mmm), 200.22(b), and 200.22(d)(2)(ii).

4.  Ferncliff failed to monitor the progress of BIPs, as required by 8 N.Y.C.R.R. § 200.22(b)(5).

5.  Ferncliff failed to draft BIPs based on the results of an FBA which meets the regulatory requirements enumerated in 8 N.Y.C.R.R. §§ 200.1(r), 200.1(mmm), 200.22, and 201.2(a).

6.  Ferncliff failed to draft Individualized Education Programs (IEPs) in the form required by 8 N.Y.C.R.R. § 200.4(d)(2).

7.  Ferncliff failed to provide IEP classroom placement assignments in violation of 8 N.Y.C.R.R. §§ 200.4(e) and 200.4(g)(1)-(2).

---

[1] DRNY receives funding from the U.S. Department of Health and Human Services (HHS), Administration on Intellectual and Developmental Disabilities (AIDD) to implement the Developmental Disabilities Assistance and Bill of Rights Act of 2000. This report and its content and conclusions are those of DRNY and should not be construed as the official position or policy of, nor should any endorsements be inferred by, AIDD, HHS, or the U.S. Government.

**New York's Protection & Advocacy System and Client Assistance Program**

8.      Committee on Special Education (CSE) meetings have been conducted without necessary members in violation of 8 N.Y.C.R.R. §§ 200.22(b)(2) and 200.3(a)(1)(iv).

9.      Ferncliff failed to provide the counseling services required by students' IEPs in violation of 8 N.Y.C.R.R. § 200.4(e).

10.     Ferncliff obstructed DRNY's investigation by tampering with documents and threatening staff with retaliation.

**New York's Protection & Advocacy System and Client Assistance Program**

## Background

DRNY received multiple complaints alleging neglect of students and residents attending Ferncliff. DRNY requested physical access to Ferncliff, which was granted. DRNY's investigation included interviewing individuals with personal knowledge of the educational and residential programs; inspecting the educational and residential facilities; and reviewing redacted records of all students' educational programming and behavior management documents.

DRNY has not completed its investigation of all of the neglect alleged, however because the findings made thus far are serious and students are suffering ongoing educational neglect that impacts their safety and wellbeing; this Preliminary Report is therefore necessary. DRNY seeks immediate remediation by Ferncliff.

## Complaints Received by DRNY

From June 25, 2014 through May 13, 2015, DRNY received multiple complaints from present and former Ferncliff staff members and from a parent of a Ferncliff student, including allegations of abuse and neglect of students with disabilities attending the program. Specifically, DRNY received complaints that Ferncliff:

- Failed to conduct FBAs for students who exhibit persistent behaviors that impede their learning or the learning of others despite school-wide or classroom-wide interventions.

- Failed to conduct FBAs for students whose behavior places them or other students at risk of harm or injury.

- Failed to create and implement systematic BIPs designed to change, replace, modify or eliminate targeted behavior.

- Failed to monitor the progress of BIPs.

- Failed to draft BIPs based on the results of complete FBAs.

- Failed to draft IEPs in the form prescribed by the Commissioner under 8 N.Y.C.R.R. § 200.4(d)(2).

- Failed to implement students' IEP-mandated classroom placements.

- Failed to have the Ferncliff School Psychologist & Director of Behavioral Services attend Committee on Special Education (CSE) meetings.

- Failed to provide the related services required by students' IEPs.

**New York's Protection & Advocacy System and Client Assistance Program**

- Failed to provide students with school health services that would have allowed the students to receive a free appropriate public education.

- Failed to implement behavior supports to address changes in medication.

- Failed to obtain consent to conduct behavioral evaluations of students, the data from which was used to create Ferncliff's "Behavior Management Strategies," "Behavioral Strategies," and "Management Strategies" documents

- Used IDEA Part B grant funds for unlawful purposes.

## Scope of Investigation

DRNY's preliminary investigation consisted of the following activities:

- Phone interviews and email exchanges with present and former members of the Ferncliff staff and a parent of a Ferncliff student.

- Observations at Ferncliff on October 27 and 29, 2014.

- Onsite interviews with Ferncliff staff and administrators on October 27 and 29, 2014.

- Review of the educational records of the seventy-three (73) students with disabilities attending Ferncliff during the 2014-2015 school year provided by Ferncliff.

- Review of the Commission on Quality of Care and Advocacy for People with Disabilities investigation records relating to Ferncliff from March 25, 2011 to April 23, 2013.

**New York's Protection & Advocacy System and Client Assistance Program**

## INVESTIGATION FINDINGS

### Ferncliff's Behavior Services System

1. **Finding: Ferncliff failed to conduct FBAs for students who exhibited persistent behaviors that impeded their learning or the learning of others, despite school-wide or classroom-wide interventions, as required by 8 N.Y.C.R.R. §§ 200.4(b)(1)(v), 200.22(a), and 200.22(b)(1)(i).**

2. **Finding: Ferncliff failed to conduct FBAs for students whose behavior placed them or other students at risk of harm or injury, as required by 8 N.Y.C.R.R. §§ 200.4(b)(1)(v), 200.22(a), and 200.22(b)(1)(ii).**

3. **Finding: Ferncliff failed to create and implement systematic BIPs designed to change, replace, modify or eliminate targeted behavior, as required by 8 N.Y.C.R.R. §§ 200.1(mmm), 200.22(b), and 200.22(d)(2)(ii).**

4. **Finding: Ferncliff failed to monitor the progress of BIPs, as required by 8 N.Y.C.R.R. § 200.22(b)(5).**

DRNY reviewed the records of seventy-three (73) students[2] currently enrolled at Ferncliff and found that:

- Twenty (20) students had FBAs and BIPs in place for the 2014-2015 school year.[3] Of those twenty (20) students, eight (8) had FBAs/BIPs which were created prior to the student's enrollment at Ferncliff.

- Thirty-three (33) students have a Ferncliff behavior strategy document attached to their record, which offers suggestions to staff on how to proactively and reactively address the student's behavior. These documents, for the reasons detailed below, do not meet the state regulatory requirements for a BIP.

- Twenty (20) students do not have any plan or strategy document in place to address behavior.

DRNY's review of the students' records indicates that approximately 90% of students have persistent behavior issues that contributed to the CSE's decision to place the student in the more restrictive educational setting Ferncliff offers. These behaviors impede the learning of the student or the learning of others, or place the student or other students at risk of harm or injury.

---

[2] DRNY received the educational programming records, including behavior management documents, for the seventy-three (73) students currently enrolled at Ferncliff. Ferncliff assigned numbers to each of the seventy-three (73) students. All personal details, including student names, were redacted from these records. Throughout this report, students will be referenced via the number given by Ferncliff.

[3] Two (2) students have both a BIP and Ferncliff behavior strategy document.

**New York's Protection & Advocacy System and Client Assistance Program**

Most commonly, these behaviors take the form of vocalizations, socially inappropriate behaviors, aggression and self-injury.

Ferncliff staff reported that students exhibit persistent and severe behavioral issues that require continual intervention. Staff stated that at least 70% of students currently require a BIP. DRNY was informed that students with the most behavioral issues are placed in education classrooms 3, 7, and 8. These students have behaviors that impede learning on a daily basis; however, according to staff very few of these students have BIPs.

- *Student number 32 has an IEP that demonstrates a need for behavioral interventions. Student 32's IEP states that: "[Student] has a long history of acting out behaviors that make engaging with [student's] peers and most adults difficult." It states that the student's behavior "often poses a direct threat to the health, safety and educational outcomes of the student, staff, and the other students in the class." The IEP states positive behavior intervention strategies and a BIP are required because of "significant behavioral problems." According to the records DRNY received, this student has neither a BIP nor a behavior strategy document in place at this time, nor is there any indication that an FBA is currently being conducted.*

Ferncliff management and behavioral services staff stated there were few FBAs and BIPs because of an overall reduction in behaviors due to school-wide interventions following students' enrollment. However, this is not the case. A review of the IEPs revised within the last twelve (12) months indicates that a large percentage of students without FBAs and BIPs continue to have behaviors that impede learning and place students at risk. This was substantiated in DRNY's interviews with Ferncliff staff and the parent of a Ferncliff student.

- *Student number 47 has an IEP that states that the student has "very involved behavioral issues." The student does not have a BIP. Instead, this student has a "Ferncliff Manor Behavior Management Strategies" document. This document lists the student's typical behaviors as elopement, non-compliance, aggression, and self-injurious. It fails to identify the baseline measure or how data is collected, and does not include a schedule to measure the effectiveness of the interventions.*

Furthermore, for those students who do have a BIP, Ferncliff staff reported that the effectiveness and progress of the interventions is rarely monitored. Many of the BIPs have not been updated in years and do not contain data sheets or documentation demonstrating that the BIP monitoring requirements have been met. This is evidenced by the fact that eight (8) of the twenty (20) BIPs were created prior to the students' enrolling in Ferncliff and have not been updated in years.

- *Eight (8) FBAs and/or BIPs were created by behavioral specialists in the students' previous schools and refer to strategies that are no longer applicable to the more restrictive Ferncliff residential school setting. For example, student number 13 has a BIP that was created in 2012 when the student attended a school in Texas. The BIP refers to transition strategies developed by the Admission, Review and Dismissal Committee (a local Texas school district special education committee) without an explanation of the strategies. The BIP also instructs staff to call the police for any violation of the Texas Criminal Statutes.*

**New York's Protection & Advocacy System and Client Assistance Program**

- *Three (3) students have BIPs drafted in 2012.*

- *Student number 68 has a BIP that has not been updated since 2009. The BIP was created prior to enrollment at Ferncliff, and lists the following target behaviors: self-injury, self-stimulating behavior, inappropriate touching, and aggression.*

Multiple Ferncliff staff reported ineffective communication between the Ferncliff School Psychologist/Director of Behavioral Services and the educational and residential staff. Staff explained that when they notified the psychologist that a student was exhibiting behaviors, their concerns were met with hostility and largely ignored. Staff reported being reprimanded for not employing out-of-date behavioral plans, even when staff had previously reported that the plans were ineffective or harmful. This resulted in staff not reporting student behaviors to the psychologist due to the anticipated hostile response. Ferncliff staff also reported that the psychologist rarely observes students in the classroom, even after teachers have requested an observation.

## Conclusion

DRNY finds that Ferncliff (1) failed to conduct FBAs for students who exhibit persistent behaviors that impede their learning or the learning of others, despite school-wide or classroom-wide interventions, as required by 8 N.Y.C.R.R. §§ 200.4(b)(1)(v), 200.22(a), and 200.22(b)(1)(i); (2) failed to conduct FBAs for students whose behavior places them or other students at risk of harm or injury, as required by 8 N.Y.C.R.R. §§ 200.4(b)(1)(v), 200.22(a), and 200.22(b)(1)(ii); (3) failed to create and implement systematic BIPs designed to change, replace, modify or eliminate targeted behavior as required by §§ 200.1(mmm), 200.22(b), and 200.22(d)(2)(ii); and (4) failed to monitor the progress of BIPs as required by 8 N.Y.C.R.R. § 200.22(b)(5).

The lack of effective behavior interventions and supports is having serious consequences on the learning and well-being of Ferncliff students. DRNY received reports that severe behavior incidents occur regularly throughout the day, including elopements and aggressive behavior that place students and staff at risk. As a result of Ferncliff's failure to conduct FBAs and create BIPs for students who need BIPs, students are being prevented from benefiting from the educational program and are at risk of harm and injury, which rises to the level of neglect.

5. **Finding: Ferncliff failed to draft BIPs based on the results of an FBA in violation of 8 N.Y.C.R.R. §§ 200.1(r), 200.1(mmm), 200.22 and 201.2(a).**

Ferncliff has created three types of behavioral support strategy documents: "Behavior Management Strategies," "Behavioral Strategies," and "Management Strategies." Other than the title, there are no discernable differences between each type of document, and no apparent reason for different titles. The quality, information, and comprehensiveness of the plans vary drastically.

**New York's Protection & Advocacy System and Client Assistance Program**

Most of the strategy documents do not identify the source of the baseline behavioral data upon which the documented behavior and suggested strategies are based, including the date of the data collection or the settings in which the data was collected.

The majority of these students have complex behavioral needs. However, staff reported that behavioral services staff or interns without required Board Certified Behavioral Analyst (BCBA) qualifications, as required by 8 N.Y.C.R.R. § 79-17, collect the data and draft the behavioral strategy documents without sufficient supervision. Further, staff reported that the psychologist rarely visits the classrooms and observes students, and that the psychologist has also asked teachers who lack the required qualifications to collect data and draft the behavior strategy documents for their students instead of the behavioral services staff. Data collection such as this falls far short of the requirement that FBAs be based on:

> [M]ultiple sources of data including, but not limited to, information obtained from direct observation of the student, information from the student, the student's teacher(s) and/or related service provider(s), a review of available data and information from the student's record and other sources including any relevant information provided by the student's parent. The FBA shall not be based solely on the student's history of presenting problem behaviors.

8 N.Y.C.R.R. § 200.22 (a)(2).

Ferncliff's behavior documents generally do not meet the standard of a BIP intervention strategy. They often do not require staff to address the behaviors impeding the student's learning, but instead contain vague generalized suggestions. Many contain nearly identical strategies that fail to account for the individualized needs of the student. Moreover, staff reported that strategy documents often recommend inappropriate strategies that appear to have been taken from another student's plan. DRNY finds, based on a review of the behavior strategy documents and conversations with staff, that behavior plans are insufficient for a significant proportion of students. These students require BIPs that identify specific antecedent behaviors and interventions. Consequently, the plans fall short of the requirements for a BIP enumerated in 8 N.Y.C.R.R. § 200.22(b).

The majority of behavior strategy documents do not contain a schedule for measuring the effectiveness of the strategies prescribed. Only four (4) of the thirty-three (33) plans include a monitoring or data collection schedule. Two (2) of the four (4) use the exact same language: "If behaviors increase and do not continue on the decreasing trend we are experiencing an assessment of the function of his behaviors will be done." There is no indication that an FBA has ever been considered or completed for either student. There is no time period specified, nor are there instructions for how an increase or decrease in behaviors should be measured.

- *Student number 28 has a one-page behavioral management strategy document. The document includes a background summary that explains that the student has an alert for elopement and Pica (the continual eating of substances without nutritional value), which is further documented in the student's IEP. However, the behaviors listed for the student are rumination, occasional self-injurious behaviors, pacing and inappropriate touching. There is no explanation about whether elopement and Pica continue to be an issue for*

**New York's Protection & Advocacy System and Client Assistance Program**

*this student. There are three (3) proactive and three (3) reactive strategies listed. There are no strategies listed to address inappropriate touching. The document states that self-injurious behaviors are no longer an issue. However, the behavior management strategies have not been updated since October 30, 2013, and the IEP, which was projected to be implemented on July 7, 2014, continues to list self-injurious behaviors, Pica, and elopement as behavioral issues experienced by the student. There is no schedule to measure the effectiveness of the strategies.*

## Conclusion

Ferncliff's current behavior strategy documents do not meet the regulatory requirements for FBAs and BIPs. The BIPs that are in place fail to effectively address the behaviors that interfere with the student's ability to learn. DRNY's review of student records and interviews with staff indicate that multiple students with behavior strategy documents, but no BIPs, have behaviors that impede their or other students learning and place the student or other students at risk. DRNY finds that Ferncliff failed to draft BIPs based on the results of an FBA that meets the regulatory requirements enumerated in 8 N.Y.C.R.R. §§ 200.1(r), 200.1(mmm), 200.22 and 201.2(a).

## Individual Education Programs

6. **Finding: Ferncliff failed to draft IEPs in the form prescribed by the Commissioner as required by 8 N.Y.C.R.R. § 200.4(d)(2).**

Seventeen (17) students currently do not have an IEP in the form required by 8 N.Y.C.R.R. § 200.4(d)(2). Instead, these students have a "Ferncliff Manor Individualized Program Plan" ("IPP"). The IPP is a standardized form unique to Ferncliff, and the form does not ask whether the student requires positive behavioral interventions or a BIP, the date of the last CSE meeting or when the educational program is to be implemented, as is required by 8 N.Y.C.R.R. § 200.4(d)(2). The IPP form does contain a section to list behavioral supports, but this section is often left blank. Therefore the IPP is not an acceptable substitute for the IEP form required by the Commissioner's regulations.

## Conclusion

Ferncliff's use of the IPP is a violation of 8 N.Y.C.R.R. § 200.4(d)(2).

7. **Finding: Ferncliff failed to provide the staff to student ratios required by the students' IEPs in violation of 8 N.Y.C.R.R. §§ 200.4(e) and 200.4 (g)(1)-(2).**

Ferncliff moved its educational facility to a new location on September 3, 2014 and the staff to student ratio for all Ferncliff classes was changed from 6:1+3 to 8:1+3. DRNY reviewed all student IEPs and determined that none of the IEPs which require a 6:1+3 were amended through

**New York's Protection & Advocacy System and Client Assistance Program**

the proper CSE process to reflect a change in classroom size to 8:1+3. Further, multiple staff complained that the 8:1+3 ratio is inappropriate for the majority of students and is leading to an increase in student behaviors and impediments to accessing the educational program.

## Conclusion

Ferncliff's unilateral change in student to staff ratios from a 6:1+3 to 8:1+3 placement violates at least thirty-six (36) student IEPs under 8 N.Y.C.R.R. §§ 200.4(e) and 200.4 (g)(1)-(2).

8. **Finding: CSE meetings have been conducted without necessary members in violation of 8 N.Y.C.R.R. §§ 200.22(b)(2) and 200.3(a)(1)(iv).**

Multiple IEPs indicate that the CSE meetings took place without mandated participants. There is no indication that a waiver was received for exclusion of necessary parties. The majority of IEPs accompanied by an attendance page do not indicate the attendance of a school psychologist or another person qualified to interpret the behavioral evaluation results. This was the case for students with FBAs and BIPs and for students with behavior strategy documents, including students for whom monitoring was prescribed in order to determine if an FBA was necessary. Of the fifty-six (56) IEPs reviewed, Ferncliff's psychologist was listed as attending only one CSE meeting.

## Conclusion

Ferncliff has held CSE meetings without all necessary members in violation of 8 N.Y.C.R.R. §§ 200.22(b)(2) and 200.3(a)(1)(iv), and the resulting lack of expertise to interpret behavioral data has interfered with the educational program of students.

9. **Finding: Ferncliff failed to provide related services required by students' IEPs in violation of 8 N.Y.C.R.R. § 200.4(e).**

Ferncliff staff reported that counseling services listed on students' IEPs are not provided. Staff also stated that Ferncliff's psychologist had requested that counseling services be removed from any student's IEP, without a CSE meeting, prior to the production of the student's documents to DRNY.

- *Of the seventy-three (73) IEPs and IPPs reviewed by DRNY, only two (2) students (48 and 51) have counseling listed as a required service. Student number 11's IEP refers to the need for counseling services but does not contain counseling as a listed service.*

Additionally, staff reported that even though numerous students have IEPs requiring that they receive physical therapy, occupational therapy, counseling services, and/or speech and language services, these services have not been provided in months or years. This aspect of the complaint has not yet been verified.

**New York's Protection & Advocacy System and Client Assistance Program**

## Conclusion

DRNY has reason to believe that, students are not receiving the counseling services, and potentially other related services, to which they are entitled as part of their free appropriate public education, in violation of 8 N.Y.C.R.R. § 200.4(e).

## Obstruction of DRNY Investigation

10. **Finding: Ferncliff obstructed DRNY's investigation by tampering with documents and threatening staff with retaliation.**

Multiple staff members reported that student records were drafted without sufficient behavioral data and altered in advance of their production to DRNY. For example, staff informed DRNY that the behavior strategies documents and BIPs were being drafted by adapting a standardized strategy plan or with boilerplate language and not based on an FBA or any other individualized behavioral data or evaluations. Staff also reported that these newly created documents were backdated to mislead DRNY and give the appearance of having been reviewed by the CSE when they had never been shared with the CSE.

Staff reported to DRNY that behavior strategy documents and BIPs were created for students who previously had no individualized behavioral supports in place. Furthermore, staff informed DRNY that the drafting of these documents placed the Ferncliff students at serious risk, as behavioral services staff were away from the school building drafting and backdating documents instead of providing the necessary behavior supports in the education setting. This resulted in insufficient number of staff present to conduct emergency procedures in the event a student had a behavioral episode or experienced an emergency.

DRNY brought these allegations to Ferncliff's attorney, who denied that backdating or document creation had occurred. However, subsequent interviews with current Ferncliff staff confirmed that such document creation and backdating did occur. Staff confirmed that they had been asked to backdate receipt of documents and to implement strategies and BIPs only recently created.

Staff complained to DRNY that staff was being retaliated against by Ferncliff management for perceived involvement or cooperation with DRNY's investigation. Prior to DRNY's visit, staff were told to be vague and not answer any of DRNY's questions directly. Since DRNY began investigating, staff reports that they have been repeatedly told by Ferncliff management not to speak with DRNY.

DRNY's review of the documents received reveals a number of inconsistencies that support these allegations:

- *In October 2014, Ferncliff claimed that only eight (8) students had BIPs. The documents received from Ferncliff contain BIPs for twenty (20) students, many of which are dated prior to October 2014.*

**New York's Protection & Advocacy System and Client Assistance Program**

- *Multiple behavior strategy documents contain the same language and strategy suggestions with minor variations. For example, the management strategy documents for student 18 and student 20 use the same language verbatim. Under the "Ideas for staff when he engages in behaviors" section, both documents state: "[a] change in facial expression may occur before aggressive behaviors. At this time, the classroom is removing the TA from the room that may correlate with severe aggression and is typically the recipient of [Student's] aggression." The management strategies document for student 18 is dated 10/28/14, while the management strategies for student 20 states it was as created on 11/20/12 and updated on 2/1/13.*

- *There is inconsistent redaction of information that does not require redaction, which prevents DRNY from identifying information for particular students. For example, the date of the CSE meeting is redacted in the IEP for student 5 and student 14, while this information is un-redacted in almost every other document. The IEP for student 5 states that a FBA and BIP are pending, but no FBA or BIP is a part of these records.*

- *The "Behavior Plan" for student 17 appears to have been created by a staff without expertise and is different from other behavioral plans. The plan references a female student, while the IEP and the FBA refer to a male student.*

## Conclusion

DRNY has concluded that Ferncliff staff altered student records prior to disclosure to DRNY.

**New York's Protection & Advocacy System and Client Assistance Program**

## PROPOSED IMMEDIATE RESOLUTIONS

To address the foregoing systemic concerns, DRNY has requested a meeting to discuss these findings with Ferncliff and recommend that it implement the following remedial actions:

- Convene CSE meetings for all students without BIPs to discuss whether the student requires an FBA and BIP. A psychologist, as a necessary member of the CSE, must attend each meeting and share with the CSE all relevant behavioral information and data collected about the student. All behavior strategy documents must be reviewed with the CSE and consent must be obtained for any future evaluations that may be necessary.

- Ensure that all BIPs address behavior and interventions in both the school setting and the residence setting. To that end, Ferncliff should ensure that FBAs are conducted in both the educational and residential settings.

- Hire licensed behavior analysts to provide behavioral support to students as required by 8 N.Y.C.R.R. § 79-17.

- Immediately reduce classroom sizes to 6:1+3 to meet the requirements of students IEPs.

- Assign one full-time behavioral services staff member to be specifically responsible for education classrooms 3, 7, and 8 only. Schedule regular observation periods during which the school psychologist will observe students in the classrooms.

- Implement regular team meetings between the behavioral services department and the teachers for each classroom. Implement regular team meetings between the behavioral services department and residence managers and staff.

- Convene CSE meetings for all students with Ferncliff Manor Individualized Program (IPP) Plans and redraft in the required IEP form.

- Create a standardized form and policy for the creation of behavioral strategies for students whom the CSE determines do not require a BIP. This policy should specify how often and under what conditions a plan will be revisited in light of new behavioral data collected.

- Develop a policy for behavioral data collection, including the requirement that data be collected in person in both the educational and residential settings. The school psychologist should create a standardized policy for the collection and monitoring of behavioral data for students who require behavioral strategies because an FBA has determined a BIP is not needed. The required consent must be obtained for collection of data. Documentation of the need for behavioral strategies and the existence of a behavioral strategies document should be listed in a student's IEP.

**New York's Protection & Advocacy System and Client Assistance Program**

- A standardized procedure and policy should be developed for school and residential staff to report behavioral developments and concerns to the school psychologist, and for the school psychologist to inform school and residential staff of any changes to a student's treatment or education program that may affect his or her behavior ahead of time.

- Counseling services must commence immediately for all students requiring such services. Make-up sessions should be scheduled immediately for any missed counseling sessions. The need for counseling services should be discussed at all upcoming CSE meetings and a counselor or counselors should be hired if necessary to meet the counseling needs of the Ferncliff population.

- Hire related services providers and ensure that all students receive the related services mandated by their IEPs, including all compensatory services owed. Restructure related services system to increase oversight over the provision of related services and district of residence billing.

- All staff should be re-trained on the mandated reporter requirements.

- Structural changes to Ferncliff's management system should be made to ensure oversight of the Director of Behavioral Services and staff.

- An effective confidential complaint mechanism for staff to anonymously report complaints.

--END--

**New York's Protection & Advocacy System and Client Assistance Program**