# Exhibit 3



**NYS JusticeCenter**
For the Protection of People with Special Needs

Andrew M. Cuomo, *Governor*
Jeff Wise, *Executive Director*

161 Delaware Avenue, Delmar, New York 12054
TEL: 518-549-0200

December 11, 2014

Mr. Stefen R. Short, Esq.
Staff Attorney
Disability Rights New York
25 Chapel Street, Room 1005
Brooklyn, NY 11201

Re: Information Request concerning Ferncliff Manor

Dear Mr. Short:

This letter is in response to your correspondence dated September 16, 2014 and November 14, 2014, where you request information concerning Ferncliff Manor under the Freedom of Information Law (FOIL) and your Protection and Advocacy authority.

The Justice Center has received 16 reports of incidents involving individuals receiving services at Ferncliff Manor that have been classified as abuse or neglect. Four of these have been closed with a final determination. One closed case included a substantiated finding and the other three cases resulted in unsubstantiated findings. Another case was closed as a duplicate report.

The Justice Center investigated one of the closed cases with unsubstantiated findings. The other three closed cases with final determinations, including one with a substantiated finding and two others with unsubstantiated findings, had been delegated to OPWDD,[1] the licensing agency, for investigation.

The remaining 11 abuse or neglect cases involving Ferncliff Manor are pending. Of those, nine were delegated for investigation to OPWDD, and two to the Justice Center. These cases are either in active investigation status, or the investigative report and recommended outcome is being reviewed by the Justice Center.

With respect to your question about criminal prosecution activity, there are presently no open or closed prosecutions of individual Ferncliff Manor-related custodians based on allegations of abuse or neglect known to the Justice Center.

---

[1] The Justice Center delegates only to the licensing agency. The licensing agency may then ask the provider to conduct the investigation. However, the Justice Center does not track, as a data element, the delegation of an investigation by the licensing agency to a provider.

I have also attached three letters of concern relating to Ferncliff Manor that were issued as the result of reviews by the Commission on Quality of Care and Advocacy for Persons with Disabilities.

Finally, with respect to the individual investigative reports, I would ask you to follow the established procedures we have already instituted to access those reports from the Justice Center. That includes the submission of an authorization from the individual service recipient involved or their personal representative, to share their privileged information. However, should you choose to exercise your independent authority to investigate incidents of abuse or neglect, please be advised that the concerned provider of services will be in possession of the investigative report concerning any substantiated finding by the Justice Center.

I trust this responds to the above-cited correspondence.

Sincerely,

Jan Perlin
Records Access Officer



ANDREW M. CUOMO
GOVERNOR

STATE OF NEW YORK
COMMISSION ON QUALITY OF CARE AND ADVOCACY
FOR PERSONS WITH DISABILITIES
401 STATE STREET
SCHENECTADY, NEW YORK 12305-2397

1-800-624-4143 (Voice/TTY/Spanish)
www.cqc.ny.gov

ROGER BEARDEN
ACTING CHAIR

BRUCE BLOWER
PATRICIA OKONIEWSKI
MEMBERS

March 25, 2011

William and Patricia Saich
Executive Directors
Ferncliff Manor
1154 Saw Mill River Road
Yonkers, NY 10710

Dear Mr. and Mrs. Saich;

This letter is intended to share concerns arising from a recent site visit to your agency conducted by The New York State Commission on Quality Care (CQC).

The purpose of our visit was to determine the cause of a number of concerning injuries incurred by resident ████████████    The Commission found that ████████ did indeed have a number of injuries including a scratched and bruised upper left check near the eye, a large bruise on ██ right buttocks, as well as cuts and scratches along the right side of ██ back. The Commission interviewed all of the staff assigned to ████████ during the week prior to the discovery of these injuries and was unable to obtain sufficient explanation for ████████ injuries. After review of ████████ files, information shared during the course of interviews, and a tour of ████████ living quarters the Commission found the following concerns:

- According to ████████ individualized program plan he is to be within arms length of staff at all times while in the program. Given that staff could not provide a clear and thorough explanation for ████████ injuries, we have significant concerns with regards to how closely staff are following ████████ supervision plan. However, we also noted that staff assigned to ████████ were also assigned to two additional children. It is not possible for one staff member to follow ████████ supervision requirements while supervising two other children.

- ████████ supervision plan is inconsistent with the half hour checks performed by overnight staff.

- Some of ████████ injuries were reported prior to the Commission's notification of ████ injuries. These injuries were documented by the facility when they were discovered without an explanation for how they were incurred. There was no follow up with the



staff who were supervising ███████ prior to the discovery to ensure that ██ injuries were not a result of neglect.

There were several concerns expressed by program staff and discovered by the Commission during the site visit relating to ███████ overall care and treatment in the program.

- ███████ Behavior Intervention Plan calls for staff to provide ███████ with a regular sensory intervention of ██ choice every forty five minutes however ███████ options in ██ living quarters appear to be limited to using ██ wagon. Staff reported a need for more program space, sensory activities, for an ability to be outside or in a less cramped physical space, and reduced stimulation for ███████

- Staff reported concerns about ███████ communication needs and lack of improvement in communication goals. Review of ███████ Behavior Intervention Plan calls for staff to use PECS and a picture schedule that is supposed to be incorporated into ██ program during both school at non-school hours. The Commission did not find evidence that this was occurring with ███████ outside of ██ regular school day.

- ███████ was sleeping on a mattress on the floor at the time of the Commission's site visit. The Commission was informed that ███████ bed had been removed for some time due to concerns regarding ██ jumping on the bed springs and placing ██ fingers in the bed springs. There was nothing found in ███████ Behavior Intervention Plan or Individual Program Plan to explain why ███████ did not have a bed. Furthermore the Commission noted that ███████ roommates all had beds and staff did not express concerns regarding ███████ placing ███████ at risk on those beds. The program has since reported that ███████ has been moved to a platform bed.

███████ has a ███████████████████████████ Staff reported that ███████ has been digging at the site and felt that ██ may be suffering from a great deal of pain. Nursing staff reviewed with the Commission their concerns about having the area drained due to ███████ risk of infection. We ask that you provide us with an update as to how this issue is being addressed.

Finally, our review of your internal investigation into this matter noted that it was cursory and did not thoroughly address the allegation. There were no interviews conducted and no assessment with regards to whether or not the program acted in accordance with policy and procedure, regulations, and ███████ treatment plan.

We ask that you respond to the aforementioned concerns no later than April 25, 2011. Please thank ███████ and ███████ for their assistance during this investigation.

Under Article 6 of the Public Officers Law, final agency determinations are required to be available for public inspection. This letter will be deemed a final agency determination 30 days after the date of this letter, which affords you an opportunity to respond to our findings

prior to any disclosure pursuant to the Public Officers Law. Material which is required to be kept confidential or which is protected from disclosure under the Public Officers Law or other laws will be redacted prior to any such disclosure.

Sincerely,

Meghan E. Keegan, MSW
Facility Review Specialist
Division of Children's Quality
Assurance and Investigations

/ey

cc: Sheila McBain, NYS OPWDD



STATE OF NEW YORK

COMMISSION ON QUALITY OF CARE AND ADVOCACY

FOR PERSONS WITH DISABILITIES

401 STATE STREET

ANDREW M. CUOMO

GOVERNOR

ROGER BEARDEN

CHAIR

BRUCE BLOWER

April 26, 2012

William and Patricia Saich
Executive Directors
Ferncliff Manor
1154 Saw Mill River Road
Yonkers, NY 10710

Dear Mr. & Mrs. Saich:

The Commission has reviewed correspondence dated April 25, 2011 and received on August 2, 2011 in which Donna Gronowski responds to our March 25, 2011 letter of concern regarding our recent site visit to your facility.

In your response you took the following corrective actions with regards to this Commission's concerns related to ▮▮▮▮▮ care and treatment at your facility: Ferncliff Manor agreed to clarify staffing procedures for ▮▮▮▮▮; establish a procedure with Quality Assurance to provide consistent documentation of how an injury occurred and the follow up to be completed with the staff who were caring for ▮▮▮▮▮ at the time the injury was incurred or discovered; the behavior team will generate appropriate sensory activities that ▮▮▮▮▮ can utilize in ▮ bedroom; Quality Assurance will review bed assessments monthly if the child is not sleeping on a regular bed; ▮▮▮▮▮▮▮▮ will be monitored by ▮ physician; as well as improvements made to the internal investigative process to ensure more thorough investigations are incorporated.

In your response you stated that you no longer provide 1:1 supervision of residents as it is no longer required of your facility and that you were unable to identify where in ▮▮▮▮ IPP it is stated that ▮ is to be within arms length of staff at all times. On ▮▮▮▮ of ▮ IPP, initiated in ▮▮▮▮▮▮ provided to this Commission from your facility as the IPP on file during the period of time in question and referred to again in your response to our concerns, under the section Challenging Behaviors it states "▮▮▮▮ is impulsive, aggressive, and constantly in motion. ▮▮▮ needs constant supervision and to be in arms length at all times of an adult." This statement is further enforced by ▮▮▮▮▮▮▮▮ Residential Assessment which again states that ▮ requires constant supervision as a result of both ▮▮ medical and behavioral needs. This was the document on file at the time of this Commission's site visit and also the document provided to this Commission with your letter of response.



The Commission is fully aware that you no longer provide 1:1 supervision and never included any references to ██████ being on 1:1 supervision in its letter of concern. This Commission asked that you address how your facility would ensure that ██████ supervision needs, as you have identified them to be, will be met in the future as it is clear, based on the investigation that we conducted, that █ supervision needs were not met during the periods of time that █ incurred these injuries. According to ██████ IPP, staff should have been within arms reach of ████ at all times. Staff were not able to provide this Commission with an explanation for ████ numerous and significant injuries making it difficult to believe that ██████ was provided with adequate supervision in accordance with █ IPP. This Commission also questioned how staff could be accountable to remain within arms length of ████ at all times while also being assigned supervision of another resident.

You also expressed concern with regards to bed checks that occur during the overnight. According to your response, bed checks occur on an hourly basis. According to our staff interviews which included overnight staff, ██████ bed checks occur every half hour and are done so in accordance with ████████ Again regardless of whether ████ is receiving half hour or hour bed checks this Commission's concerns were related to how staff were carrying out ██████ identified supervision needs if they clearly were not remaining in continual close proximity to him during the overnight hours. ██████ IPP does not address whether █ supervision needs change during sleeping hours.

The Behavior Intervention Plan that was provided to this Commission is dated ████ ████████ The plan awaiting ████████ approval ████ is irrelevant to the Commission's concerns regarding the provision of services to ████ at the time of our site visit. It is clear that the facility failed to provide staff with the tools required to fulfill ██████ BIP during this time period as there were limited sensory intervention options and no visual aides in █ residential space at the time of our site visit. According to the BIP these interventions were to be carried out both in the classroom and ██ residential area.

This matter is now considered to be closed. Thank you for your cooperation with this Commission.

Our findings letter, your reply, and our response will be publicly available and may be posted to the Commission's website. Confidential or privileged material will be redacted prior to any such disclosure.

Sincerely

Meghan E. Keegan, MSW
Facility Review Specialist
Division of Children's Quality
Assurance and Investigations

/ey
cc:  Megan O'Connor-Hebert, OPWDD
     Colleen Myers, OPWDD

2

Ms. Meghan E. Keegan

Facility Review Specialist

Division of Children's Quality Assurance and investigations

NYS Commission on Quality of Care and Advocacy

401 State Street

Schenectady, New York, NY 12305-2397

April 25, 2011

Dear Meeghan,

This letter is in response to the concerns presented by yourself in your letter dated March 25, 2011.

1) We were unable to identify where *in* ▓▓▓▓▓ *IPP it is stated that* ▓ *is to be "within arms length of staff at all times" while in the program.*

▓▓▓▓▓ was 1:1 up until ▓▓▓▓ when our 1:1 staffing pattern was changed to the hard to place model staffing pattern. During the period ▓ was 1:1 the instructions to staff were that the 1:1 must shadow their child. This meant that the papraprofessional must be with the child at all times. It further explained that when walking with the child you should at no time be outside the grasping distance of the child. (appendix #1).

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ This again was prior to the program change to the hard to place model. The parameters of the services provided ▓▓▓▓ changed on ▓▓▓▓ the School District's Committee for Special Education (CSE) was informed and accepted the change. After ▓▓▓▓▓ was no longer provided 24 hour 1:1 staffing.

The hard to place staffing pattern approved for Ferncliff Manor basically allows for a pool of staff that are deployed as the acuity of the children requires and is basically set for a 1:2 ratio. The actual application of the staffing pattern is set – up to provide 2 staff to every group of 4 children. As ▓▓▓▓ needs frequently require that ▓ have an individual staff member. The staff and children are grouped together for any one activity varies within those numbers.

We would like to further clarify your concern and take any actions necessary. We need further direction as to the place in the record where you found the statement *"within arms length of staff at all times" while in the program* .

**PLAN TO CORRECT:**
The Director of Student Life and Recreation will clarify the staffing and procedure for supervising ███████ in the residence by May 2, 2011.

2) The concern that ██████████ *"plan is inconsistent with the half hour checks performed by over night staff"*, is confusing because the over night staff document checks for every child that are completed every hour (appendix #3) on the intervention sheets. Night shift staff are strategically placed through – out the units in order to provide supervision and assistance to each child as needed. Staff move in and out of room all night and provide actual documentation hourly as stated above. We would like to address any further inconsistency and would need more details as to where this is found in the record.

3) The concern that injuries reported prior to the Commissions notification of █ injuries were *"documented by the facility when they were discovered without an explanation for how they were incurred"* and that *"there was no follow – up with the staff who were supervising* ██████████ *prior to the discovery to ensure that* █ *injuries were not a result of neglect."*





**PLAN TO CORRECT:**

The Quality Assurance Coordinator will establish the process / routine of consistent documentation of the explanation of how an injury occurred and the follow – up completed with the staff who were caring for ▮ during the specific period in question for each instance. This process will be established by May 2, 2011.

The School Psychologist and Behavior Team will be reporting on the results of the Daily Data (appendix 8) sheets and ▮ response to ▮ behavior program next at ▮ annual IPP meeting on ▮

4) The concern that ███████ Behavior Intervention Plan calls for "staff to provide with regular sensory intervention of █ choice every 45 mins, however ███████ options in █iving quarters appear to be limited to using █ wagon."



ince this █████ the Behaviorists, Teacher, House Manager and Curriculum Coordinator have been providing on – going hands on training with the staff during their working hours on the unit or in the classroom. Daily Data sheets (appendix #6) are being completed and the data is being presented in graph format.

The "need for more program space, sensory activities, for an ability to be outside or in less cramped physical space, and reduced stimulation for █████████ is a well documented need for all the children. There is one all purpose room for gross motor activities, meals, movies, etc. Living areas are often bustling with activity making bedrooms the only less stimulating environment. This is an on – going program management concern and a major focus of the new building  project in which Ferncliff Manor is fully involved.

**PLAN TO CORRECT:**

The Psychologist and Behavior Team met with staff on ████████ to review ████ Behavior Intervention Plan and start the Daily Data sheets. During ████ annual IPP meeting on ████████ as stated above, a summary of progress will be presented. The next Behavior Team meeting

regarding ▮▮▮▮▮ will be held after that meeting. The Behavior Team will generate sensory appropriate activities that can be utilized especially, in ▮ bedroom environment which is less stimulating.

Behavior Intervention Plans designed for children under the care of ACS will be reviewed for consent by ACS incases where the parent is refusing to sign.

5) The concern that ▮▮▮▮▮ communication needs and lack of improvement in communication goals. Review of ▮▮▮▮▮ Behavior Intervention Plan calls for staff to use PECS and a picture schedule that is suppose to be incorporated into ▮ program during both school and non- school hours." As stated above, prior to ▮▮▮▮▮ program was directed by the Behavior Management Plan, which did not involve PECS or picture schedules.

Prior to ▮▮▮▮▮ this was not regularly occurring outside ▮ school day. After ▮▮▮▮ The use of PECS and a picture schedule was started. Currently, the picture schedule is posted on the wall in ▮ bedroom. PEC's pictures for toilet, and some of ▮ favorite activities are available for ▮ to point to when choosing an activity.

6) The concern that "▮▮▮▮▮ was sleeping on a mattress on the floor at the time of the Commission site visit."



Since the Commission's visit ▮▮▮▮▮ and the identification of this concern, ▮▮▮▮ has been progressed to a platform bed that is 6 inches off the ground, which is the height of a normal metal frame low bed.

**PLAN TO CORRECT:**

The Quality Assurance Coordinator will develop a system to track the bed assessments and ensure that they are reviewed annually if the child is sleeping on a normal mattress in a normal height bed and monthly if the child is utilizing adaptive sleeping devices such platform on the floor or high sided mattress. This system will be implemented by May 15, 2011.

7) The concern that "▮▮▮▮▮▮▮ is not accurate. ▮▮▮▮▮▮▮▮



has been seen by many specialists.

**PLAN TO CORRECT:** The current plan is to work with ▮▮▮▮▮ on a care plan and to continue to monitor ▮▮▮ regimen and routine.

8) The concern that **"Our review of your internal investigation into this matter was cursory and did not thoroughly address the allegation. There were no interviews conducted and no assessment with regards to whether or not the program acted in accordance with the policy and procedure, regulations and ▮▮▮▮▮ treatment plan."**

**PLAN TO CORRECT:** The Investigation summery format typically used includes the listing of all individuals interviewed. This was not present in the summary. As of April 25, 2011, all Investigation Summary Reports will have sections titled: 1) Policy and Procedures Reviewed and 2) Regulations Reviewed and 3) Treatment Plan Reviewed in addition to other areas and individuals interviewed. This will ensure that these areas are addressed in the investigation process.

Thank you very much to Ms. Meghan Keegan, MSW for the time she spent during her visit and her thorough review. We hope this was able to clarify the concerns presented. Please contact Donna Gronowski, Quality Assurance Coordinator or myself if you need further information or clarification.

Sincerely,



Susan L. Moon, B.S.,RN

Director of Nursing

*Appendix #1*

## FERNCLIFF MANOR OFFICIAL DOCUMENT

TITLE: Guidelines for 1:1 Protocol            DATE: 10/09/06

PRIMARY MANUAL: Residential Department    DATES REVIEWED: 10/07, 10/08

1. The 1:1 Paraprofessional **must** shadow their child.    This means that the Paraprofessional must be with the child at all times.
2. When walking with the child the paraprofessional must hold the child's wrist or interlock your arm with the child's. At no time should you be outside the grasping distance of the child.
3. If the child is seated, the paraprofessional must position himself/herself between the individual and other children.
4. When the child goes to the bathroom, the paraprofessional must accompany the individual to the bathroom. The paraprofessional must wait until the child is finished and then walk back with the child.
5. It is important to follow the child's behavior plans as written. The behavior plans are located in the intervention books. The paraprofessional's input is invaluable when writing and revising the behavior plans.
6. The paraprofessional is to participate with the child in their goals and activities on a daily basis.
7. The paraprofessional is to participate with the child using the child's particular means of communication such as PECS, sign or verbal communication.
8. Paraprofessionals are responsible for their child and are expected to pay close attention to the child at **ALL** times.
9. When the paraprofessional goes on break/restroom, they must assign their child a supervisor, or another staff person who has a 1:1. This way that staff member will have a 2:1 for the duration of the break period. If there is more than one paraprofessional in the room, they should not go on a break at the same time. Each person who goes on break should make sure that they know who is in charge of their child. During the time that a staff member has a 2:1 they should stay in the area where there is other staff members and should engage the two children in a preferred activity that both enjoy. AT NO TIME SHOULD A 1:1 CHILD BE LEFT UNATTENTED FOR ANY REASON.

10. When reassigning a child, the paraprofessional going on break/restroom must communicate their intentions. The receiving paraprofessional must clearly understand and accept the responsibility being asked of him/her. If communication is not clear or the assignment cannot be accepted a supervisor must be notified immediately.

11. Upon accepting a 2:1 assignment, the receiving paraprofessional **CANNOT** reassign the child to another staff member. Only a supervisor can accept a reassignment for emergency purposes only. For example, if a child is exhibiting aggressive behaviors or child has had an accident and needs to be toileted. Staff caring for another 1:1 must ensure that the additional 1:1 in their care is maintained clean and dry for the duration of the break. This means the child should be toileted and/or have their diaper checked frequently throughout the break. Fun activities should be offered at this time for example, coloring, toys, or books and magazines. No 1:1 should be left alone for any reason or for any amount of time. Staff with groups <u>cannot</u> accept a 1:1 assignment for any reason. Any and all incidents that occur during the break period must be written by the relieving 1:1. Supervisors and nurses must be notified immediately when an incident has occurred.

12. The paraprofessional is expected to assist the teacher in preparing all paperwork regarding their child's IEP or IPP.

13. The paraprofessional is expected to accompany their child to and from all therapy sessions.

14. The paraprofessional is expected to carry over the child's therapy goals into the classroom or daily activity. For example, if the child is working holding a crayon with a certain grip; then the paraprofessional should help the child to continue to use that grip while in class.

15. The paraprofessional is to report any behavioral, physical, or medical changes to a supervisor, nurse or psychologist immediately.

RE:

DOB: ███████

12/15/11

Dear Meghan Keegan,

In response to your letter, we have reviewed and addressed each of your concerns, see attached response from Denise Kinard, Director of Student Life.

Follow-up Investigator Concerns:

1. How will facility ensure that staff are adequately supported to provide appropriate behavior management to all residents?

2. ███████ completed an incident report but failed to note that ███████ made an allegation of abuse or notify program administration of the allegation. ███████ health was not immediately assessed and an investigation did not begin until ███████ made a second report the following afternoon.

Please call myself or Donna, if you have further questions.

Sincerely,

Susan L. Moon, B.S., RN, Director of Nursing

Donna Gronowski, QA



S.A.I.L at ▓▓cliff Manor

To: CQC

From: Denise Kinard, Director of Student Life

Date: December 20, 2011

Re: Letter dated August 22, 2010 ███████████

In response to the Commission letter dated August 22, 2010 regarding the assigned staff that was assigned to ████████. The staff assigned to ████████ was removed immediately after the incident escalated. Prior to an incident escalating, our staff are trained to de-escalate a situation by verbally redirecting a resident. In the event that does not work, the staff immediately inform a supervisor/manager for assistance.

████████ was new to our facility and was not adjusting well at that particular time. ██ was very demanding of staff that ██ wanted to work with and did not adhere to our rules. ██ was not accepting of too many staff members. Unfortunately, we found out that having ████████ assigned to a ████ staff member was not the best thing for ██ at the time. When the incident occurred, we immediately removed the staff and provided ██ with alternative behavior methods on how to deal with difficult residents. We also implemented a procedure in which a staff member who is assigned to a difficult resident with not work with that particular person for the entire shift, that way he/she does not burn out. Also, the supervisor/manager assigned to that unit works directly with the staff to ensure he/she is following the protocol and all behavior techniques. In the event the manager/supervisor/staff member is having difficulty, he/she will be placed in training once again.

During the event in which ████████ alleged that ██ was struck by the staff and the manager failed to report that particular information, ████████ the manager assigned to that unit was placed on a 30 day probationary period and placed back in training. During the probation period, ████████ met with the Director of Student Life on a bi-weekly basis to go over incident report writing and was observed during ████ shift. In regards to the staff who was allegedly accused. The facility did a thorough investigation and found out that the information provided by ████████ was false. We try to take all measures in maintaining compliance with OPWDD regulations with all staff members of the facility.



ANDREW M. CUOMO
GOVERNOR

STATE OF NEW YORK
COMMISSION ON QUALITY OF CARE AND ADVOCACY
FOR PERSONS WITH DISABILITIES
401 STATE STREET
SCHENECTADY, NEW YORK 12305-2397
1-800-624-4143 (Voice/TTY/Spanish)
www.cqc.ny.gov

ROGER BEARDEN
CHAIR

BRUCE BLOWER
PATRICIA OKONIEWSKI
MEMBERS

January 11, 2012

William and Patricia Saich
Directors
SAIL at Ferncliff Manor
1154 Saw Mill River Road
Yonkers, NY 10710

Dear Mr. & Mrs. Saich:

The Commission has reviewed correspondence dated December 20, 2011 in which Denise Kinard and Susan L. Moon responds to our August 22, 2011 letter of concern regarding resident █████████

The Commission finds your response to be adequate and has no further concerns. We now consider this matter now closed.

Thank you for your cooperation with this Commission.

Our findings letter, your reply, and our response will be publicly available and may be posted to the Commission's website. Confidential or privileged material will be redacted prior to any such disclosure.

Sincerely,

Meghan E. Keegan, MSW
Facility Review Specialist
Division of Children's Quality
Assurance and Investigations

/ey

cc: Alan Eskenazi, OPWDD
    Colleen Myers, OPWDD





ANDREW M. CUOMO
GOVERNOR

STATE OF NEW YORK
COMMISSION ON QUALITY OF CARE AND ADVOCACY
FOR PERSONS WITH DISABILITIES
401 STATE STREET
SCHENECTADY, NEW YORK 12305-2397
1-800-624-4143 (Voice/TTY/Spanish)
www.cqc.ny.gov

ROGER BEARDEN
CHAIR

BRUCE BLOWER
PATRICIA OKONIEWSKI
MEMBERS

August 22, 2011

William and Patricia Saich
Executive Directors
Ferncliff Manor
1154 Saw Mill River Road
Yonkers, NY 107110

Dear Mr. & Mrs. Saich:

This letter is intended to share concerns arising from a recent site visit to your facility conducted by The New York State Commission on Quality Care (CQC). The purpose of our visit was to determine whether resident ▇▇▇▇▇▇▇ was struck by a staff member.

The Commission expressed concerns to your facility with regards to ▇▇▇▇ being assigned to a new staff member ▇ was not familiar with as well as the fact that this staff member was left to work with ▇▇▇▇ for an extensive period of time despite the fact that ▇▇▇▇ was displaying an increase in behaviors specifically targeting the assigned staff member. The Commission notes your Incident Review Committee found similar concerns and enacted appropriate corrective action with regards to staffing ▇▇▇▇ However this change does not address the broader concerns of assigning new staff members to provide care for behaviorally challenging or high needs children without appropriate support and training.

In addition the Commission noted that the assigned staff member had many challenges with ▇▇▇▇ over an extended period of time on the date of this event and it was not until after this incident occurred that a staff change was ordered. The corrective actions taken by your facility do not address how your facility will ensure that staff are adequately supported in order to provide appropriate behavior management to all residents.

During the course of this investigation the Commission interviewed several staff members who were working in the program at the time of this alleged event. Staff reported that ▇▇▇▇ alleged that ▇ was struck and reported this information to ▇▇▇▇▇▇▇ immediately following the incident. ▇▇▇▇ completed an incident report but failed to note that ▇▇▇▇ made an allegation of abuse or notify program administration of the allegation. ▇▇▇▇ health was not immediately assessed and an investigation did not begin until ▇▇▇▇ made a second report the following afternoon. This is not in compliance with 14

NYCRR 624 which requires that programs complete an incident report and begin an investigation into all allegations of abuse immediately.

We ask that you respond to the aforementioned concerns no later than September 22, 2011. Please thank ██████ and ████████ for their assistance during this investigation.

Under Article 6 of the Public Officers Law, final agency determinations are required to be available for public inspection. This letter will be deemed a final agency determination 30 days after the date of this letter, which affords you an opportunity to respond to our findings prior to any disclosure pursuant to the Public Officers Law. Material which is required to be kept confidential or which is protected from disclosure under the Public Officers Law or other laws will be redacted prior to any such disclosure.

Sincerely,

██████████████████

Meghan E. Keegan, MSW
Facility Review Specialist
Division of Children's Quality
Assurance and Investigations

/ey

cc: James Moran, NYS OPWDD

2

| | CQC Concerns | Corrective Action |
|---|---|---|
| 1 | Agency's investigation was less than thorough and did not clearly support the investigatory question. | "Form 149 Investigative Report Format- Completion Instructions (issued 2/17/12)" was reviewed. Instruction notes were added to the form 149 template for use when conducting the investigation (attached). Each section was noted to give guidance in that specific area. "Avoiding 10 Common Problems in Incident Investigating" published by CQC and "Required Investigative Report Format", A. Bruno, OPWDD Office of Investigations and Internal Affairs and L. Fuld, OPWDD Incident Management Unit, were also reviewed by investigators and will continue to be used as a resource. Investigators have completed "Incident Investigation Training" provided by IAC and have reviewed resources provided. |
| 2 | Statements were inconsistently completed. Some were signed or initialed by the individual while others were not, and some written by Quality Assurance Coord. While others were written by the individual interviewed. | Statements and interviews will be written and signed as described in the training materials listed in issue # 1. |
| 3 | During the investigation, the Commission was told by a Behavior Specialist that the Consumer has a history of falsely accusing others of physical abuse, however it is not documented for staff to be aware of and /or to address appropriately. | Directors and Managers have reviewed "Policy and Procedures Regarding Staff Reporting" (attached). Since our initial discovery of the consumer making false accusations, there has been several occurrences documented. The Behavior team has conducted observations and the Behavior Strategies will be updated to include information needed by staff for treatment planning. |



ANDREW M. CUOMO
GOVERNOR

STATE OF NEW YORK
COMMISSION ON QUALITY OF CARE AND ADVOCACY
FOR PERSONS WITH DISABILITIES
401 STATE STREET
SCHENECTADY, NEW YORK 12305-2397

1-800-624-4143 (Voice/TTY/Spanish)
www.cqc.ny.gov

JOHN RYBALTOWSKI
ACTING CHAIR

BRUCE BLOWER
PATRICIA OKONIEWSKI
MEMBERS

April 23, 2013

William Saich
Executive Director
S.A.I.L. at Ferncliff Manor
1154 Saw Mill River Road
Yonkers, NY 10710

Dear Mr. Saich;

The Commission is in receipt of an April 15, 2013, email in which Quality Assurance Director, Donna Gronowski responds to the Commission's March 14, 2013, letter of concern regarding the agency's investigation into an allegation of abuse involving ███████████.

As the corrective actions taken appear to address our concerns, we are concluding our review at this time. Thank you for your attention to this matter.

Please be reminded that the findings letter, your reply, and the Commission's response, if any, will be publicly available and may be posted to the Commission's website. Confidential or privileged material will be redacted prior to any such disclosure.

Sincerely,

Doreen Bowser
Team Leader
Division of Children's Quality
Assurance and Investigations

/ey

cc: Megan O'Connor-Hebert, OPWDD
    Colleen Myers, OPWDD





ANDREW M. CUOMO
GOVERNOR

STATE OF NEW YORK
COMMISSION ON QUALITY OF CARE AND ADVOCACY
FOR PERSONS WITH DISABILITIES
401 STATE STREET
SCHENECTADY, NEW YORK 12305-2397

1-800-624-4143 (Voice/TTY/Spanish)
www.cqc.ny.gov

JOHN RYBALTOWSKI
ACTING CHAIR

BRUCE BLOWER
PATRICIA OKONIEWSKI
MEMBERS

March 14, 2013

Mr. William Saich
Executive Director
S.A.I.L. at Ferncliff Manor
1154 Saw Mill River Road
Yonkers, NY 10710

Dear Mr. Saich:

This letter shares concerns arising from a site visit to your agency conducted by the Commission on Quality of Care and Advocacy for Persons with Disabilities (the Commission) on ███████. During this site visit, the Commission investigated an allegation of physical abuse involving ████████ consumer ███████████.

The Commission reviewed the agency's internal investigation into the above noted incident, which included interview statements, Anecdotal Reports, Intervention Sheets and the OPWDD 149: Investigative Report. The agency investigation determined that the allegation was inconclusive, opining that ███████ somehow sustained the red mark to ██ back by either being kicked by another consumer or while the target staff member was trying to separate ████ and that other consumer. While it is acceptable to determine an allegation to be inconclusive, the agency's investigation was less than thorough and did not clearly support the investigatory conclusion. For example, although the ███████ staff member provided few details in ██ statement, what was stated did not comport with the agency's investigative conclusions. For instance, the ██████ staff member cites a struggle between ██████ and the other consumer, in which ██████ was trying to pull the other consumer out of bed by ██ hands. During the struggle, the other consumer reportedly kicked ███████. The ██████ staff member claims to have intervened by separating the two consumer's hands and directing ██████ to go sit down. The ██████ staff member did not describe how the children were positioned which could support or refute that the other consumer was in a position to have kicked ██████ on the area of ██ back where ██ injury was noted. Furthermore, it is unclear as to how ███████ sustained an injury to ██ back when the ██████ staff member apparently only intervened by separating the two consumer's hands. It appears that the conclusion drawn was supported by assumptions rather than facts.

Additionally, the Commission found that the agency's interview statements were inconsistently completed. Some were signed or initialed by the individual while others were not, and some were written by the ████████████████████ while others were written by the individual being interviewed.

Finally, during the its investigation, the Commission was told by the agency's ████████ ████████ that ████ has a history of falsely accusing others of physical abuse. However, this information is not reflected in any of ████████ documentation for staff to be aware of and/or address appropriately. Additionally, this information contradicts other information received by the Commission, as ████████ staff report that ████████ provides reliable information of details in such cases. Although it is not conducive to label individuals with making false allegations, it is important for all members of an individual's treatment team to have, and provide, the same information on an individual for treatment planning purposes.

The Commission asks that your agency address the findings noted above and develop a corrective plan to rectify these concerns to include proper policy and procedural changes, and training of residential staff, as well as individuals responsible for internal investigations, as appropriate.

We ask that you provide the Commission with documentation certifying that these concerns have been successfully addressed by no later than April 15, 2013. Please contact me should you have any question regarding this request. Your anticipated cooperation in providing this information is greatly appreciated.

Our findings letter, your reply, and our response, if any, will be publicly available and may be posted to the Commission's website. Confidential or privileged material will be redacted prior to any such disclosure.

Sincerely

Andrea L. Deepe
Facility Review Specialist I
Division of Children's Quality
Assurance and Investigations

/cy

cc: Megan O'Connor-Hebert, OPWDD
    Colleen Myers, OPWDD

2